**STATE of Maine**

v.

**Craig PETTINGILL.**

Supreme Judicial Court of Maine.

Argued June 18, 1992.

Decided July 27, 1992.

---

Michael E. Carpenter, Atty. Gen., Wayne S. Moss (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Richard Slosberg (orally), Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS and RUDMAN, JJ.

COLLINS, Justice.

Craig Pettingill appeals from a conviction of manslaughter, 17-A M.R.S.A. § 203 (Supp.1991)[1], entered in the Superior Court (Cumberland County, *Fritzsche J.*) after a jury verdict. He contests a number of the court's rulings on pretrial and evidentiary matters. He also contests its denial of his motions for acquittal and for a new trial. Finding no merit in his arguments, we affirm the judgment.

### I.

Pettingill was indicted for the murder of James Monaldo. Police arrested him and Nicholas Hassapelis a few days after Monaldo was killed, when they found the two in the victim's truck. In taped interviews Pettingill told police that he and Hassapelis robbed the victim and that Hassapelis shot Monaldo. Hassapelis was tried separately.

Pettingill was arraigned and pleaded not guilty. He later moved to dismiss the indictment and to suppress evidence, claiming that statements he had made to police were illegally obtained. The Superior Court (*Lipez, J.*) held a hearing concerning both motions. A few weeks later, it issued an order denying both.

At the trial, the State called fifteen witnesses, ranging from fellow inmates[2] to law enforcement officers, and introduced into evidence recordings of the statements Pettingill had made to police. In the presentation of his case, Pettingill called a number of witnesses and testified himself. He sought to call Timothy Scott Smith to testify about statements that Richard Nielson had made to him, implying that Nielson killed Monaldo. The court refused to allow Smith to testify about this hearsay statement because Nielson was available to tes-

---

1. The statute provides, in pertinent part,
   1. A person is guilty of manslaughter if that person:
      A. Recklessly, or with criminal negligence, causes the death of another human being....

2. During the course of the trial, Pettingill was incarcerated at the Maine State Prison on other convictions. Two fellow inmates testified that Pettingill had confessed to killing Monaldo.

tify. Pettingill also attempted to call Roland Villacci, but Villacci invoked his Fifth Amendment privilege not to testify. After Pettingill rested, the State called two rebuttal witnesses.

The jury returned a verdict of guilty of manslaughter, a lesser included offense in the murder charge. After a hearing, the court denied Pettingill's motion for a new trial.

On June 28, 1991, after an updated presentence investigation had been prepared, the court (*Fritzsche, J.*) sentenced Pettingill to seventeen years of incarceration and ordered that the sentence be served consecutively to sentences already imposed regarding other convictions.

## II.

Pettingill argues that the two taped statements admitted in evidence were obtained in violation of his constitutional rights. He contends that the audiotaped conversation with detective Young in April, 1989 was involuntary and improperly conducted without his counsel, and that the video-taped interview with Detectives Young and Gomane in September was involuntary.

The court's (*Lipez, J.*) conclusion that both taped interviews were voluntary is reviewed for clear error. *State v. Hutchinson,* 597 A.2d 1344, 1346 (Me.1991). Pettingill claims that, because he was responding to threats from Nicholas Hassapelis and Richard Nielson [3] and coerced by Officer Young, the statements were involuntary. The motion court, however, heard Pettingill's testimony as to the threats and heard the tape. We defer to its assessment of credibility. *State v. Harriman,* 467 A.2d 745, 747 (Me.1983). Moreover, Pettingill made the statements to "put himself in a better position," thus, they were an "exercise of his own free will and rational intellect." *State v. Hutchinson,* 597 A.2d at 1346, *quoting State v. Caouette,* 446 A.2d 1120, 1123 (Me.1982).

---

[3] Pettingill, Hassapelis and Nielson were inmates at the Maine State Prison at the time Pettingill was interviewed. Pettingill claims

Nor are we persuaded that Pettingill's rights were violated because the April interview was conducted without his counsel present. He had not been charged with a crime in connection with the Monaldo homicide, so his Sixth Amendment rights were not triggered. *Maine v. Moulton,* 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985). Although Pettingill had previously invoked his right to counsel pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Superior Court found that he had initiated the conversation by asking his mother to have Officer Young contact him, and had knowingly and intelligently waived his right to have counsel present, after being read the *Miranda* warnings. *See State v. Libby,* 546 A.2d 444, 448 (Me.1988); *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

## III.

Pettingill contends that inculpatory statements he made to fellow inmates should have been excluded because the inmates were agents of the state and violated his constitutional rights by interrogating him without advising him of those rights. Although the state's use of an agent to elicit incriminating statements from a suspect may violate his Fifth and Sixth Amendment rights, *Arizona v. Mauro,* 481 U.S. 520, 526–30, 107 S.Ct. 1931, 1934–37, 95 L.Ed.2d 458 (1987); *Maine v. Moulton,* 474 U.S. at 177 n. 14, 106 S.Ct. at 488 n. 14, Pettingill has failed to allege any facts that indicate that the inmates to whom he made statements were agents of the state. Both of the witnesses contacted officials only after Pettingill made the statements to them. The Fifth and Sixth amendment protections do not apply to statements made to private individuals. *State v. Joubert,* 603 A.2d 861 (Me.1992).

## IV.

Pettingill argues that the trial court erred by denying his motion for acquittal at

that the two threatened him not to talk to police because they were afraid that Pettingill would reveal their role in the Monaldo homicide.

the close of the State's case. Contrary to his contentions, we review the sufficiency of the evidence on the whole record, *State v. Lyons,* 466 A.2d 868, 871 (Me.1983), and conclude that it was sufficient to allow the jury rationally to find every element of the offense beyond a reasonable doubt. *See State v. Preston,* 581 A.2d 404, 409 (Me. 1990).

## V.

■ Pettingill sought to admit the testimony of a Timothy Scott Smith at trial. Since Smith's testimony would be hearsay, Pettingill attempted to establish that the declarant, Nielson, was unavailable, so that Smith's testimony might be admissible under M.R.Evid. 804(b). Nielson testified, in a *voir dire* examination, that he did not know Smith, and that he had not killed Monaldo nor told anyone that he had done so. After *voir dire,* the court concluded that Nielson was not unavailable as that term is defined in M.R.Evid. 804(a)[4].

Pettingill's claim that Nielson refused to testify and/or claimed lack of memory about his statements to Smith is simply not supported by the *voir dire* transcript. Although he testified to a lack of memory about certain matters, Nielson flatly denied making the alleged statements. The finding that Nielson was not unavailable cannot be said to constitute clear error.[5] *See State v. Caouette,* 462 A.2d 1171, 1176 (Me.1983).

## VI.

Pettingill called Roland Villacci as a witness at trial. Villacci, however, invoked the privilege against self-incrimination, and refused to testify. On Pettingill's request, the transcript of Villacci's testimony at Hassapelis' trial was read to the jury.[6] Pettingill now contests the court's determination that Villacci was entitled to invoke this constitutional privilege.

■ Contrary to Pettingill's contention, Villacci did not waive his privilege against self-incrimination when he testified at Hassapelis' trial. "A waiver of the Fifth Amendment privilege is limited to the particular proceeding in which the waiver occurs." *State v. Linscott,* 521 A.2d 701, 703 (Me.1987), *quoting United States v. Licavoli,* 604 F.2d 613, 623 (9th Cir.1979). Nor did the court err in concluding that Villacci's testimony would have "a real and appreciable tendency to incriminate" him. *Linscott,* 521 A.2d at 703, *quoting In re Kave,* 760 F.2d 343, 354 (1st Cir.1985). The court properly concluded that Villacci was entitled to assert the privilege when his proffered testimony would *"furnish a link* in the chain of evidence needed to prosecute or ... *might lead* to other evidence that could be used in a criminal prosecution." *Linscott,* 521 A.2d at 703, *quoting In re Kave,* 760 F.2d at 354 (emphasis in original).

## VII.

■ Pettingill's brief lists, as one of the issues on appeal, "Whether the trial justice erred in denying Pettingill's motion for a new trial." It fails, however, to advance any argument on the subject. Arguments which are not briefed are deemed waived; we will deal with such issues only when necessary to preserve the defendant's right to a fair and impartial trial.

---

**4.** The rule provides, in pertinent part,

   (a) **Definition of Unavailability.** "Unavailability as a witness" includes situations in which the declarant:

   .    .    .    .    .

   (2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or

   (3) testifies to a lack of memory of the subject matter of his statement; ...

**5.** Pettingill's claim that Nielson's statement to Smith was made in circumstances indicating its trustworthiness is not reached if Nielson was not unavailable. M.R.Evid. 804(b)(3) provides that a statement tending to subject the declarant to criminal liability is admissible only if he is unavailable and "corroborating circumstances clearly indicate the trustworthiness of the statement."

**6.** Villacci had testified that he had assisted Hassapelis in acquiring a gun while both were in custody at the Cumberland County Jail, and that later, when both were at the jail again, Hassapelis had told him that he (Hassapelis) had used the gun in the Monaldo homicide.

*State v. Rusher,* 468 A.2d 1008, 1009 (Me. 1983); *State v. Brunette,* 501 A.2d 419, 422 (Me.1985). That right is not implicated here.

## VIII.

The State has filed a motion in Superior Court pursuant to M.R.Crim.P. 35(a). It notes that the sentence, set to run consecutively to a split-sentence for a previous conviction, would result in Pettingill's release from custody to serve probation on the earlier sentence only to be returned to prison for this sentence, a violation of 17–A M.R.S.A. § 1256(8) (Supp.1991) and our decisions in *State v. Keefe,* 573 A.2d 20, 22 (Me.1990), *State v. Parks,* 544 A.2d 1269, 1271–72 (Me.1988), and *State v. Whitmore,* 540 A.2d 465, 467 (Me.1988). The State asked the court to exercise its authority under 17–A M.R.S.A. § 1202(4) to terminate the earlier sentence's probation term so Pettingill may serve the instant sentence immediately upon completing his current incarceration term. After a hearing, the Superior Court has certified to us that it would grant the motion. Pursuant to M.R.Crim.P. 35(e), we remand the case to the Superior Court for this correction.

The entry is:

Judgment affirmed. Remanded to the Superior Court for sentence correction.

All concurring.